TRANSAMERICA PREMIER                              CIVIL ACTION
LIFE INSURANCE COMPANY

VERSUS                                                No. 18-7993

JOEL MICHAEL GUY, JR., ET AL.                       SECTION I

## <u>ORDER & REASONS</u>

This statutory interpleader case concerns life-insurance benefits payable for the deaths of a married couple: Joel Michael Guy, Sr. ("Joel Sr.") and Lisa Guy ("Lisa"). A Tennessee jury convicted their son, Joel Michael Guy, Jr. ("Joel"), a potential beneficiary, of murdering both Joel Sr. and Lisa.

Now before the Court are two motions[1] for partial summary judgment—each filed by a pair of contingent beneficiaries related to Joel Sr. and Lisa—both of which seek (1) to declare Joel ineligible to receive benefits under the applicable slayer statute,[2] and (2) judgment on their claims for their respective portions of the interpleaded funds. Joel, proceeding *pro se*, opposes each motion.[3] For the reasons below, the Court grants one motion in full and grants the other only in part, denying without prejudice the rest of it.

---

[1] R. Doc. Nos. 27 & 30.
[2] A slayer statute "prohibits a person's killer from taking any part of the decedent's estate through will or intestacy." *Slayer Statute, Black's Law Dictionary* (9th ed. 2009).
[3] R. Doc. Nos. 49 & 57.

## I.     BACKGROUND

The parties, including Joel,[4] do not dispute the following facts.  In 2014, the predecessor of the interpleader plaintiff here, Transamerica Premier Life Insurance Company ("Transamerica"), issued a group accident insurance policy to the National Rifle Association.[5]  Because Joel Sr. was a member of the National Rifle Association, Transamerica issued to him an insurance certificate (the "Certificate") under the policy.[6]  The Certificate provided accidental-death insurance coverage for both Joel Sr. and his spouse, Lisa—obligating Transamerica to pay $152,500 in benefits for Joel Sr.'s death, and $150,000 for Lisa's.[7]

In November 2016, Joel Sr. and Lisa were found dead in their home due to an apparent homicide.[8]  Their son, Joel, was later convicted by a Tennessee jury for the first-degree murders.[9]  Judgment was entered in November 2020, and Joel was sentenced to serve two consecutive life sentences in state prison.[10]  Joel appealed his case; that appeal is still pending.

Neither Joel Sr. nor Lisa designated any beneficiaries for their policies.[11] Where no beneficiary was designated, the Certificate provides that benefits are paid

---

[4] As discussed further below, Joel argues only that Louisiana's slayer statute is invalid on due process grounds because it automatically disqualifies him from the policies' benefits based upon his conviction, and prior to the conclusion of his first appeal as of right.  R. Doc. No. 49, at 1–2; R. Doc. No. 57, at 3.
[5] R. Doc. No. 1-1, at 1–2 ¶ 3.  The policy number is MZ0933572H0000A.  *Id.*
[6] *Id.* at 2 ¶ 4.  The Certificate bears the number 7500164824.  *Id.*
[7] *Id.* at 2 ¶¶ 4–6.
[8] *Id.* at 2 ¶ 7.
[9] R. Doc. No. 22-1.
[10] *Id.* at 15.
[11] R. Doc. No. 1-1, at 3 ¶ 10; *id.* at 4 ¶ 17.

to the "first surviving class of the following classes of persons: (1) lawful spouse; (2) lawful child or children; (3) lawful mother or father; (4) lawful sisters or brothers; [and] (5) estate of the Covered Person."[12]

To determine the correct beneficiary under the Certificate, therefore, Transamerica would have needed to decide at least two legal questions: first, since it was "impossible" to determine if Joel Sr. or Lisa died first, whether either spouse is statutorily deemed to have predeceased the other and therefore is not entitled to the other's benefits;[13] and second, whether the relevant state's slayer statute barred Joel from taking under both policies.[14] Not wanting to be mired in conflicting claims, Transamerica opted for interpleader.[15] It filed this action in August 2018—after Joel was charged with the murders, but before his conviction.[16]

Transamerica joined as defendants (1) Joel, (2) Crystal Michelle Dennison and Angela Crain ("Michelle and Angela"), the daughters of Joel Sr. (but not Lisa) and Joel's half-sisters; and (3) Alvin Madere Jr. and Paula Madere Kinler ("Alvin and Paula"), who are Lisa's siblings.[17] Michelle and Angela jointly crossclaimed against Joel to declare him disqualified (under the relevant slayer statute) from receiving any portion of Joel Sr.'s (but not Lisa's) insurance benefits.[18] Alvin and Paula did the

---

[12] *Id.* at 15. For present purposes, the "Covered Person[s]" were Joel Sr. and Lisa. *See id.* at 11.
[13] *Id.* at 3 ¶ 11; *id.* at 4 ¶ 18.
[14] *Id.* at 4 ¶ 14; *id.* at 5 ¶ 20.
[15] *Id.* at 4 ¶ 16; *id.* at 5–6 ¶ 25.
[16] R. Doc. No. 1, at 5 ¶ 16; *id.* at 7 ¶ 24; *id.* at 9 ¶ 31.
[17] R. Doc. No. 1, at 1–2 ¶¶ 1–5.
[18] R. Doc. No. 17.

same, but only as to Lisa's benefits.[19]  Each pair of joint cross-claimants consent to the relief sought by the other pair.[20]  Joel, meanwhile, has not filed a crossclaim, but he "assert[s] the continuing validity of [his] claims to the insurance proceeds" for both policies.[21]

In May 2019, this Court stayed this matter pending the resolution of Joel's murder trial.[22]  After a telephone status conference on January 21, 2021, the Court granted Alvin and Paula's unopposed motion to lift the stay.[23]  Alvin and Paula filed a timely motion for partial summary judgment on their crossclaim,[24] as did Michelle and Angela as to their crossclaim.[25]  Joel opposed both motions,[26] to which neither Alvin and Paula nor Michelle and Angela replied.[27]

Transamerica deposited into the Court's registry the interpleaded funds, which totaled $200,833.33.[28]  Of that, $150,000 was the total amount payable under Lisa's policy—the sum otherwise payable to Joel as Lisa's only child;[29] and $50,833.33 was the remaining amount payable under Joel Sr.'s policy—the sum otherwise payable to

---

[19] R. Doc. No. 10.
[20] R. Doc. No. 27, at 1; R. Doc. No. 30, at 1.
[21] R. Doc. No. 12, at 3 ¶ 2 (Joel's answer).
[22] R. Doc. No. 19.
[23] R. Doc. No. 26, at 2.
[24] R. Doc. No. 27.
[25] R. Doc. No. 30.
[26] R. Doc. Nos. 49 & 57.
[27] Alvin and Paula attempted to file a reply memorandum without first seeking leave of Court to do so; the Clerk of Court marked the filing as deficient and struck it from the record, providing seven days to cure the deficiency.  *See* R. Doc. No. 52.  Alvin and Paula did not attempt to refile the memorandum.
[28] R. Doc. Nos. 13 & 14.
[29] R. Doc. No. 1-1, at 5–6 ¶ 25.

Joel after deducting Michelle and Angela's shares.[30]  By consent of all parties, $10,000 of the interpleaded funds were disbursed to Transamerica for costs and reasonable attorneys' fees,[31] and Transamerica was dismissed and discharged from the case.[32]

Three claims remain pending before the Court: (1) the overall interpleader claim to "determine . . . the party to whom the Certificate's proceeds are payable;"[33] (2) Alvin and Paula's crossclaim, which seeks (a) to declare Joel ineligible for any of Lisa's benefits, and (b) an award of the remaining benefits due under Lisa's policy—$142,531.12 plus 74.68% of the interest that has accrued on the registry funds;[34] and (3) Michelle and Angela's crossclaim, seeking (a) to declare Joel ineligible for any of Joel Sr.'s benefits, and (b) an award of the remaining benefits due under Joel Sr.'s policy—$48,302.21 plus 25.32% of the interest that has accrued on the registry funds.[35]  Alvin and Paula consent to the relief sought by Michelle and Angela, and vice versa.[36]

---

[30] *Id.* at 3–4 ¶ 13.  The total amount payable for the death of Joel Sr. was $152,500. *Id.* at 2 ¶ 6.  Transamerica has already paid Michelle and Angela, Joel Sr.'s daughters, their share of the proceeds, $101,666.66; the disputed portion that remains is what would have been paid only to Joel, as Joel Sr.'s remaining child.  *Id.* at 3–4 ¶ 13.

[31] R. Doc. No. 29.

[32] R. Doc. No. 39.

[33] R. Doc. No. 1, at 9 ¶ 32.

[34] R. Doc. No. 27, at 2.  This sum accounts for Alvin and Paula's share (74.68%) of the attorney's fees paid to Transamerica from the interpleaded funds (*i.e.*, 74.68% of the $10,000 attorney fee was deducted from the $150,000 sum payable under Lisa's policy).  R. Doc. No. 27-3, at 6.

[35] R. Doc. No. 30, at 2.  This sum accounts for Michelle and Angela's share (25.32%) of the attorney's fees paid to Transamerica from the interpleaded funds (*i.e.*, 25.32% of the $10,000 attorney fee was deducted from the $50,833.33 that remains payable under Joel Sr.'s policy).  *Id.* at 1.

[36] R. Doc. No. 27, at 1; R. Doc. No. 30, at 1.

## II.    JOEL'S MOTIONS

Before considering the motions for partial summary judgment, the Court first addresses a number of *pro se* motions filed by Joel.  These include: (1) a motion for court-appointed counsel;[37] (2) a motion to supplement his motion for appointed counsel by appending to it an application to proceed *in forma pauperis*;[38] (3) two motions that are contingent on the Court appointing counsel—which ask that Joel be allowed to amend his opposition memoranda to the motions for summary judgment if counsel is appointed;[39] and (4) a motion to amend, regardless of whether he is appointed counsel, his opposition memoranda to the motions for summary judgment.[40]

For the reasons that follow, the motion for appointed counsel is denied, the motion to supplement the motion to appoint counsel as well as the two motions to amend his responses to the summary judgment motions if counsel is appointed are dismissed as moot, and the motion to amend his responses to the motions for summary judgment, regardless of whether counsel is appointed, is granted.

*Appointed Counsel*

In support of his motion for appointed counsel, Joel argues, in substance, that: he cannot afford an attorney; he is "unable to attempt to obtain pro bono legal counsel;" his "incarceration will greatly limit [his] ability to litigate;" several "issues

---

[37] R. Doc. No. 55.
[38] R. Doc. No. 60.
[39] R. Doc. No. 56 (relating to Joel's response to R. Doc. No. 27); R. Doc. No. 58 (relating to Joel's response to R. Doc. No. 30).
[40] R. Doc. No. 59.

in this case are constitutional in nature, and will require significant research," which

he cannot do himself because he is in solitary confinement and has limited access to

the prison's law library; and that opposing counsel "routinely neglect to serve their

filings upon" him[41]—hence, appointing counsel "would eliminate the need for

opposing counsel to provide service by mail," because his counsel could simply review

filings electronically.[42]

Although there "is no right to appointment of counsel in civil cases," a district

court "may appoint counsel if doing so 'would aid in the efficient and equitable

disposition of the case.'" *Delaughter v. Woodall*, 909 F.3d 130, 140–41 (5th Cir. 2018)

(quoting *Jackson v. Dallas Police Dept.*, 811 F.2d 260, 262 (5th Cir. 1986)).   To

determine if that is the case, courts generally consider four factors:

> (1) the type and complexity of the case; (2) whether the indigent is
> capable of adequately presenting his case; (3) whether the indigent is in
> a position to investigate adequately the case; and (4) whether the
> evidence will consist in large part of conflicting testimony so as to
> require skill in the presentation of evidence and in cross examination.

*Id.* (quoting *Ulmer v. Chancellor*, 691 F.2d 209, 213 (5th Cir. 1982)).   Ultimately,

however, "appointment of counsel should be reserved for cases presenting 'exceptional

circumstances.'"   *Id.* (quoting *Ulmer*, 691 F.2d at 213); *see also Haley v. Natchitoches

Par. Det. Ctr.*, 602 F. App'x 1008, 1009 (5th Cir. 2015) (denying a request for the

appointment of counsel because the prisoner failed to "present 'exceptional

circumstances'" (quoting *Ulmer*, 691 F.2d at 213)).

---

[41] Joel has waived service, however.  R. Doc. No. 5.
[42] R. Doc. No. 55, at 2–11.

Considering the four *Ulmer* factors, the Court is not persuaded that this case presents "exceptional circumstances" that require the appointment of counsel. *Delaughter*, 909 F.3d at 140–41. First, the factual and legal issues are not complex—who, among a finite group of interpleaded defendants, is entitled to benefit under the terms of two identical life insurance policies. Second, Joel has proven more than capable of articulating his arguments in writing—raising relatively novel arguments as to the requirements of procedural due process.[43] Third, although Joel is in solitary confinement, there is nothing, as far as either Joel or any other party has made the Court aware of, left to investigate. Fourth, the evidence will not consist in large part—or, for that matter, in any part[44]—of conflicting testimony, and therefore does not require the skill of evidence presentation and cross-examination. Joel has presented no factual arguments to this Court—he advances only legal arguments.

All told, this is not the type of exceptional case that requires the appointment of counsel. Accordingly, the Court will deny this motion.

*In Forma Pauperis Application*

Joel then filed a "Motion to Amend Request for Appointment of Counsel," which states, "I feel that I probably should have included one of the application forms for in forma pauperis status along with that motion [to appoint counsel]. . . . I respectfully

---

[43] R. Doc. No. 57.

[44] Indeed, none of the claimants dispute the facts asserted by any of the others, R. Doc. No. 27, at 1; R. Doc. No. 30, at 1, and even Joel states that he "willingly concede[s] that, if, and only if, my criminal convictions are eventually affirmed at the conclusion of the direct appeal process, then, under the Louisiana slayer statute, this court should automatically disqualify me from receiving the disputed insurance proceeds." R. Doc. No. 49, at 1.

request that the court consider the [attached] completed form as part of the motion requesting the appointment of counsel."[45]  Attached to the motion is the standard form to request pauper status in federal court.[46]

Because Joel intended to use this motion merely to supplement his motion to appoint counsel—rather than to request pauper status[47]—and because the Court will deny that motion for appointed counsel, this motion is now moot.  Accordingly, the Court will dismiss the motion as moot.

### Motions to Amend Opposition Memoranda if Counsel is Appointed

Joel also filed two motions to amend, should this Court appoint counsel, his opposition memoranda to the two motions for partial summary judgment.[48]  These two motions are now moot, as the Court will deny his motion to appoint counsel for the reasons just described.  Accordingly, the Court will dismiss these two motions.

### Motion to Supplement Joel's Opposition to Motions for Summary Judgment

Finally, Joel filed a motion to supplement his memorandum opposing Alvin and Paula's motion for partial summary judgment.[49]  He asks that the Court "consider Document 49[, which is his memorandum opposing Alvin and Paula's motion,] and the document included in this mailing"—*i.e.*, his memorandum opposing Michelle and Angela's motion—"as if they were a single, contiguous document that

---

[45] R. Doc. No. 60, at 2.
[46] *Id.* at 3–4.
[47] *See id.* at 3 ("I am not bringing a civil action or appealing a judgment at this time. I am currently only requesting the appointment of an attorney.").
[48] R. Doc. No. 56 (relating to Joel's response to R. Doc. No. 27); R. Doc. No. 58 (relating to Joel's response to R. Doc. No. 30).
[49] R. Doc. No. 59.

serves as my response for both" motions for partial summary judgment.[50]  In other words, he asks the Court to consider his two opposition memoranda as a single response to both motions.  No other party has filed an opposition to this motion.

The Court has a duty to "liberally construe[]" *pro se* filings like Joel's.  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)); Fed. R. Civ. Proc. 8(f) ("All pleadings shall be so construed as to do substantial justice.").  Granting the motion will ensure that Joel's arguments are effectively heard, so the Court will oblige.  Accordingly, the Court will grant this motion and consider both[51] of Joel's opposition memoranda jointly.

## III.   CHOICE OF LAW

With those items resolved, the Court can proceed to the substance of the matter.  But first, it must determine which state's law applies.  Since the insurance policies underlying this case were issued in the District of Columbia, and insured Tennessee residents, the choice-of-law question is whether District of Columbia law, Tennessee law, or the law of the forum state (Louisiana) should apply.

In diversity-based, statutory interpleader cases like this, federal courts apply the choice-of-law rules of the forum state.  *United States v. Jesco Const. Corp.*, 528 F.3d 372, 374 (5th Cir. 2008) (citing *Klaxon v. Stentor Elec. Mfg.*, 313 U.S. 487 (1941) and *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938)).  Louisiana, in turn, generally applies

---

[50] *Id.* at 2–3.
[51] These documents are R. Doc. Nos. 49 & 57.

"the law of the state whose policies would be most seriously impaired if its law were not applied to that issue." La. Civ. C. art. 3537.

However, "[a]ll . . . issues of conventional obligations [other than capacity and form, *see* Articles 3538 & 3539,] are governed by the law *expressly chosen or clearly relied upon by the parties*, except to the extent that law contravenes the public policy of the state whose law would otherwise be applicable under Article 3537." La. Civ. C. art. 3540 (emphasis added); *see also id.* cmt. (e) (noting that the parties' choice of law may be "implied . . . on the basis of the surrounding circumstances, especially the provisions of the contract or the conduct of the parties"); *Jesco Const.*, 528 F.3d at 374 (citing Article 3540 and applying Louisiana law because the parties "have not expressly chosen or clearly relied on the law of another state").

All parties agree that Louisiana law should apply and that, even if Tennessee or District of Columbia law applied, the result would be the same under those jurisdictions' slayer statutes.[52]  Therefore, because the parties do not "clearly rel[y] upon" the law of another state, and because no other state's policies would be more

---

[52] R. Doc. No. 27-3, at 2–3 (Alvin & Paula's memorandum); R. Doc. No. 30-2, at 2–3 (Angela & Michelle's memorandum); R. Doc. No. 49, at 1 (Joel's opposition memorandum) ("I do not contest opposing counsel's position that Louisiana substantive law should apply to this case because I agree . . . that the end result will be the same[.]").  Both the District of Columbia and Tennessee have slayer statutes similar to Louisiana's.  *See* D.C. Code § 19-320 ("A person convicted of felonious homicide of another person, by way of murder or manslaughter, takes no estate or interest in property of any kind from that other person[.]"); Tenn. Code § 31-1-106(a)–(c) ("An individual who feloniously and intentionally kills the decedent forfeits all benefits with respect to the decedent's estate.").

seriously impaired were its law not applied, the Court will apply the law of the forum state, Louisiana. La. Civ. C. art. 3540; *Jesco Const.*, 528 F.3d at 374 (doing the same).

## IV.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper when, after reviewing the pleadings, the discovery and disclosure materials on file, and any affidavits, a court determines that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. Proc. 56(a). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The party seeking summary judgment generally need not produce evidence negating the existence of a material fact; it need only point out the *absence* of evidence supporting the other party's case. *Id.* After all, "[t]here is no sound reason why conclusory allegations should suffice to require a trial when there is no evidence to support them even if the movant lacks contrary evidence." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195–96 (5th Cir. 1986).

However, "if the *movant* bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Id.* at 1195 (first emphasis added). In such cases, the movant "must come forward with evidence which would 'entitle it to a directed

verdict if the evidence went uncontroverted at trial."' *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264–65 (5th Cir. 1991) (emphasis in original) (citation omitted).[53]

Once the party seeking summary judgment carries its initial burden, the nonmoving party must come forward with specific facts showing that there is a genuine dispute of material fact for trial. *See Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The showing of a genuine issue is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). Rather, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"Although the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible . . . the material may be presented in a form that would not, in itself, be admissible at trial." *Lee v. Offshore Logistical & Transp., L.L.C.*, 859 F.3d 353, 355 (5th Cir. 2017) (citations omitted). The party responding to the motion for summary judgment may not rest upon the pleadings but must identify specific facts that establish a genuine issue. *See*

---

[53] *See also Delozier v. S2 Energy Operating, LLC*, No. 18-14094, 2020 WL 6684996, at *2, __ F. Supp. 3d __ (E.D. La. Nov. 12, 2020) (Morgan, J.) (explaining the rule and quoting *Int'l Shortstop, Inc.*, 939 F.2d at 1264–65); *id.* ("If the moving party fails to carry this burden, the motion must be denied.").

*Anderson*, 477 U.S. at 248. The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.* at 255.

## V.    ANALYSIS

As stated above, two motions for partial summary judgment are before the Court. Both seek to determine the proper beneficiaries under identical life-insurance policies—one insuring Joel Sr., the other insuring Lisa. For brevity's sake, the Court will first answer two questions common to the analysis of both—whether (1) either spouse "survived" the other, and (2) Joel is disqualified as a beneficiary—before turning to each of the cross-claimants' motions.

### A.    Joel Sr. and Lisa are Deemed to Have Predeceased Each Other

The first question applicable to both policies is whether either Joel Sr. or Lisa survived the other.[54] The Certificate's terms, which govern both policies, provide that benefits are paid to the "first surviving class of the following classes of persons:" (1) spouse, (2) children, (3) parents, (4) siblings, and (5) the estate of the insured.[55]

To determine the proper beneficiary under each Certificate, the Court must first ask whether either spouse is entitled to the other's benefits.[56] The record evidence does not indicate one way or the other—both death certificates list the same

---

[54] As discussed above, neither Joel Sr. nor Lisa designated beneficiaries for their policies. R. Doc. No. 1-1, at 3 ¶ 10, 4 ¶ 17.
[55] *Id.* at 15.
[56] *See id.* at 3 ¶ 11 (stating that Lisa would have been Joel, Sr.'s beneficiary "had she survived her husband"); *id.* at 4 ¶ 18 (stating the converse for Joel, Sr.).

time of death.[57]  Consequently, there is no record evidence that either spouse survived the other.  When that is the case, Louisiana law provides that "the proceeds of the policy shall be distributed as if the insured had survived the beneficiary, unless otherwise expressly provided in the policy."  La. Rev. Stat. § 22:911.  In other words, Louisiana law provides, unless the policy provides otherwise, that when it is impossible to determine which of two spouses died first, the beneficiary spouse is deemed to predecease the insured spouse.  *See Morelock v. Aetna Life Ins.*, 63 So. 2d 612, 614 (La. 1953) (applying the above statute[58] to presume that the beneficiary predeceased the insured, then interpreting the insurance policy to identify the next beneficiary).  The Court has reviewed the Policy and Certificate, and it has not found any provision that would otherwise contradict Louisiana law on this point.[59]

Therefore, when determining the proper beneficiaries for each policy below,[60] the Court will treat each spouse as having predeceased the other—*i.e.*, for Joel Sr.'s policy, it will treat Lisa as having predeceased him, and it will do the converse for Lisa's policy.  It will then look to the Certificate's subsequent classes of contingent beneficiaries (*i.e.*, children, parents, then siblings) to determine the proper beneficiaries.  *See Morelock*, 63 So. 2d at 614 (doing the same).

---

[57] R. Doc. No. 27-1, at 2 (Lisa's death certificate); R. Doc. No. 30-1, at 1 (Joel, Sr.'s death certificate).

[58] Although the statute in force at the time was codified at La. Rev. Stat. § 22:645, it was identical to the current version, now codified at La. Rev. Stat. § 22:911.

[59] Rather, the Certificate appears to be in accord with the statute: "the share of any beneficiary who does not survive the Covered Person will pass equally to any surviving beneficiaries unless otherwise specified."  R. Doc. No. 1-1, at 15.

[60] *See infra* Part V.C.

15

### B.   Joel May Not Benefit from Either Policy

The Court next concludes that Louisiana's slayer statute disqualifies Joel from benefiting under either of his parents' policies. That statute provides, in relevant part:

> (1) No beneficiary . . . under any personal insurance contract shall receive from the insurer any benefits under the contract accruing upon the death . . . of the individual insured when the beneficiary . . . is either:
>
>> (a) Held by a *final judgment* of a court of competent jurisdiction to be criminally responsible for the death, disablement, or injury of the individual insured[; or]
>>
>> (b) Judicially determined to have participated in the intentional, unjustified killing of the individual insured.
>
> (2) Where such a disqualification exists, the policy proceeds shall be payable to the *secondary or contingent beneficiary*, unless similarly disqualified, or, if no secondary or contingent beneficiary exists, to the estate of the insured.

La. Rev. Stat. § 22:901(D) (emphasis added).

Because a criminal conviction "puts an end to the proceedings," it is considered a "final judgment"—notwithstanding its appealability. *See, e.g.*, *In re Succession of Holder*, 200 So. 3d 878, 882 (La. Ct. App. 2d Cir. 2016). That is because an "appeal is not part of the proceedings, but is rather the exercise of the right of a defendant to have a judgment reviewed by the proper appellate court." *Id.* (citing La. Code Crim. Proc. art. 911). In fact, Louisiana courts reason that a conviction's appealability itself *demonstrates*, rather than negates, finality—as "[o]nly a final judgment or ruling is appealable." *Id.* (quoting La. Code Crim. Proc. art 912A) (internal quotation marks omitted); *see also Aetna Life Ins. v. Starks*, No. 20-1157, 2021 WL 765377, at *2 (E.D. La. Feb. 26, 2021) (Guidry, J.) (concluding that the claimant's "pending appeal of his

conviction has no bearing on whether he is eligible to receive benefits under" La. Rev. Stat. § 22:901(D)); *cf. Cal.-W. States Life Ins. Co. v. Sanford*, 515 F. Supp. 524, 528 (E.D. La. 1981) (Sear, J.) ("[T]he [slayer] statute . . . mak[es] a conviction binding on civil litigants.").

Joel was convicted by a Tennessee jury of, *inter alia*, two counts of first-degree murder for killing his parents,[61] and he was sentenced to two life sentences (plus four years).[62] That conviction is a "final judgment" under § 22:901(D)(1)(a)—and it does not matter that Joel's case is now on appeal. *Holder*, 200 So. 3d at 882. Therefore, because Joel was "[h]eld by a final judgment of a court of competent jurisdiction to be criminally responsible for the death[s] . . . of the individual[s] insured," he is statutorily barred from taking under either of his parents' policies. La. Rev. Stat. § 22:901(D)(1)(a).

Joel's arguments to the contrary, as noted above, are limited only to whether this comports with "procedural due process."[63]  He argues

> that any statutory authorization for automatic disqualification prior to the exhaustion of the appeals in my criminal case violates my right to procedural due process, guaranteed by the Louisiana Constitution and/or the Fifth and Fourteenth Amendments to the United States Constitution, prior to being summarily and irreversibly deprived of property to which I may otherwise have been entitled. The constitutional infirmity stems from the lack of scrutiny of the underlying basis for, or meaningful recourse from, such deprivation.

> To be clear: I do not dispute that the text of the Louisiana Slayer Statute authorizes automatic disqualification prior to the exhaustion of the

---

[61] R. Doc. No. 22-1, at 2–5.

[62] *Id.* at 15.  The four additional years were assessed for two counts of "abuse of corpse." *See id.* at 12–15.

[63] R. Doc. No. 57, at 3.

appeals in my criminal case, nor do I dispute that it was likely the legislature's intent that the text of the statute provide such authorization. *I merely assert the constitutional invalidity of such statutory authorization, given the ubiquity of, and significance normally ascribed to, appellate review.* . . . I contend that the right to procedural due process renders the automatic disqualification clause of the Louisiana Slayer Statute, as it is written and/or applied now, constitutionally infirm.[64]

Liberally construing his *pro se* memoranda, Joel appears to make both facial and as-applied challenges to the slayer statute's constitutionality. He argues that it violates procedural due process (under both the U.S. and Louisiana Constitutions) to disqualify an insurance beneficiary based only on the fact of a final criminal conviction that has yet to be reviewed on direct appeal. His arguments are unavailing.

The Fourteenth Amendment provides, in relevant part, that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1; *id.* amend. V ("No person shall . . . be deprived of life, liberty, or property, without due process of law[.]"). The Louisiana Constitution's comparable provision is materially identical and has been interpreted to "provide[] the same due process protections as that of the United States Constitution." *Cripps v. La. Dept. of Ag. & Forestry*, 819 F.3d 221, 232 (5th Cir. 2016); *see also Progressive Sec. Ins. Co. v. Foster*, 711 So. 2d 675, 688 (La. 1998) (noting the federal and state provisions "do[] not vary" from each other); La. Const. art. I, § 2 ("No person shall be deprived of life, liberty, or property, except by due process of law."). Therefore, the Court treats Joel's

---

[64] *Id.* at 3–4, 7 (emphasis added).

right to procedural due process under the Louisiana Constitution identically to the federal right, analyzing both as one.

As for how much process is due: "at a minimum, [the Due Process Clause] require[s] that deprivation of life, liberty, or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950). The doctrine demands only fairness:

> It is important to realize that procedural review is limited in scope. Procedural due process guarantees only that there is a fair decision-making process before the government takes some action directly impairing a person's life, liberty or property. This aspect of the due process clauses *does not protect against the use of arbitrary rules of law* which are the basis of those proceedings.

2 Ronald D. Rotunda & John E. Nowak, *Treatise on Const. L.*, § 14.6(a)(i) (2021) (emphasis added; footnotes and citations omitted). To determine whether a government practice violates procedural due process, courts generally balance three factors: "(A) the private interest affected; (B) the risk of erroneous deprivation of that interest through the procedures used; and (C) the governmental interest at stake." *Nelson v. Colorado*, 137 S. Ct. 1249, 1255 (2017) (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

To prove that the slayer statute is facially unconstitutional, Joel must "establish that no set of circumstances exists under which the statute would be valid, or that the statute lacks any plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 472 (2010). Stated in the reverse, the slayer statute is facially valid on procedural due process grounds so long as "at least some [persons]" are rightfully

19

disqualified from insurance proceeds based on their pre-appeal criminal convictions alone. *United States v. Salerno*, 481 U.S. 739, 751 (1987) (quoting *Schall v. Martin*, 467 U.S. 253, 264 (1984)) (rejecting substantive and procedural due process facial challenges to a statute authorizing pretrial detention) (alteration in original). In other words, he must show that the slayer statute violates procedural due process in *every* case, or at least that it is not "plainly legitimate" in the run of cases. *Stevens*, 559 U.S. at 472.

Considering the three *Mathews* factors, Joel loses his facial challenge to the slayer statute. First, the private interest implicated here is not weighty. For one thing, the property interest at issue—the right to *acquire* property from one's own *misconduct*—is distinct from, and subordinate to, the fundamental right to not be "deprived of" property:

> The court is not taking away from the slayer an estate which he has already acquired, but 'is simply preventing him from acquiring property in an unauthorized and unlawful way, *i.e.,* by murder. It takes nothing from him but simply says you cannot acquire property in this way.' . . . [U]nless property is taken away from the slayer as a result of his crime, it seems impossible to say that the due process of law clause is violated.

*Misenheimer v. Misenheimer*, 325 S.E.2d 195, 204 (N.C. 1985) (Exum, J., dissenting) (quoting John W. Wade, *Acquisition of Property by Willfully Killing Another*, 49 Harv. L. Rev. 715, 720–21 (1936)). For another thing, this interest is implicated relatively infrequently—only when an heir or insurance beneficiary has been found either "criminally responsible for the death, disablement or injury of the individual insured," or "[j]udicially determined" to have "unjustified[ly] kill[ed]" the insured

individual.  La. Rev. Stat. § 22:901(D)(1).  The private interest here is less than significant.

But even assuming *arguendo* that the private interest here is great, the second *Mathews* factor well outweighs it.  The risk of erroneous deprivation of property through the procedures used—*i.e.*, wrongly disqualifying a slayer from collecting insurance proceeds prior to his conviction's affirmance on direct appeal—is not substantial.  Criminal convictions carry a strong presumption of regularity, and the majority of them are affirmed on direct appeal.[65]  Therefore, the risk that this procedure will *erroneously* deprive would-be beneficiaries of property is less than compelling.  At the very least, the risk is small enough to defeat Joel's facial challenge—in most cases (never mind *all* cases, as a facial challenge requires), the conviction is affirmed on appeal and another court would be justified in relying on it.

Third, Louisiana's interests—in enforcing the well-settled slayer rule and providing for the expeditious disposition of insurance benefits—are weighty.  Slayer statutes "have been adopted by nearly every state" and enjoy "a long historical pedigree."  *Egelhoff v. Egelhoff*, 532 U.S. 141, 152 (2001) (citing *Riggs v. Palmer*, 22 N.E. 188 (N.Y. 1889)); *see also Mutual Life Ins. Co. v. Armstrong*, 117 U.S. 591, 600 (1886) ("It would be a reproach to the jurisprudence of the country if one could recover insurance money payable on the death of the party whose life he had feloniously

---

[65] *See* Nicole L. Waters, et al., *Criminal Appeals in State Courts*, U.S. Dept. of Justice: Office of Justice Programs, at 1 (Sept. 2015), https://bjs.ojp.gov/content/pub/pdf/ casc.pdf ("Of the [state court criminal convictions appealed and] reviewed on the merits, 81% were affirmed.").

taken."). Louisiana has an interest in applying its slayer rule to provide for the prompt disposition of insurance benefits; allowing the rule to attach immediately upon a conviction furthers that interest.

Therefore, Joel's facial due process challenge must fail. Considering the three *Mathews* factors, it does not violate procedural due process to disqualify an insurance beneficiary based only on his criminal conviction, even if that conviction has not yet been affirmed on direct appeal.

Nor can Joel successfully maintain his as-applied challenge to the slayer statute. The Court first questions the scope, if not the viability, of an as-applied challenge based on *procedural* due process—since "the fundamental fairness of a particular procedure does not turn on the result obtained in any individual case; rather, 'procedural due process rules are shaped by the risk of error inherent in the truth-finding process as applied to the generality of cases, *not the rare exceptions*.'" *Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 321 (1985) (quoting *Mathews*, 424 U.S. at 344) (emphasis added). But assuming that Joel may make such a challenge, it still fails.

Joel has failed to articulate how—other than by blanket and conclusory assertion—*his* convictions were "obtained unfairly."[66] Instead, he "assum[es] arguendo" that his "criminal convictions were obtained in violation of [his] rights under the United States Constitution," without elaborating further.[67] Though he

---

[66] R. Doc. No. 57, at 2.

[67] *See*, *e.g.*, R. Doc. No. 49, at 3 ("I contend that my criminal convictions were obtained in violation of my rights under the United States Constitution. Assuming arguendo

asserts that those convictions were "procured through the use of evidence that should have been excluded for myriad reasons,"[68] he goes into no more detail than that. Conclusory say-so is not enough to meaningfully dispute, let alone prove, a constitutional violation—a burden Joel must carry to defeat summary judgment based on an affirmative defense. *See Fontenot*, 780 F.2d at 1195. His failure to explain how his conviction was obtained unfairly is fatal to his as-applied challenge.[69]

Because the Court rejects Joel's arguments as to the slayer statute's provision that automatically disqualifies anyone determined by a "final judgment" to be criminally responsible for the death of the insured, La. Rev. Stat. § 22:901(D)(1)(a),

---

that this contention is accurate, I assert that it would be fundamentally absurd to allow the outcome of an unfair criminal trial to dictate the result of, or be used as unimpeachable evidence in, a quasi-criminal civil trial based upon the same facts."). Joel cannot "assume" something that he must prove. *See Fontenot*, 780 F.2d at 1195.

[68] R. Doc. No. 57, at 2.

[69] To the extent Joel claims that the proceedings *here* have been unfair, the Court notes that it has taken every reasonable precaution to ensure that is not the case. Because of the asynchronous nature of Joel's *pro se* filings—which sometimes took weeks to reach the Clerk of Court by mail—it is worth pausing to clarify the record.

For example, Joel filed a "declaration" with the Court, dated March 10, 2021, and received by the Clerk of Court on March 24, 2021, reiterating that employees at his place of confinement, opposing counsel, or both, deprived him of access to legal documents in this case. R. Doc. No. 54.

This declaration was written before Joel received, on March 15, 2021, this Court's March 8 order (and the documents accompanying it), which directed the Clerk of Court to mail copies of documents that Joel requested because he no longer possessed them. R. Doc. No. 48, at 2–3. Joel later confirmed receipt of those documents via a separate declaration received by the Clerk of Court on March 22, 2021, in which he "sincerely thank[ed] the court for sending me all of this." R. Doc. No. 53, at 2. This, combined with the Court's granting Joel's motion to consider his late-filed opposition memorandum in tandem with his timely filed memorandum, *see supra* notes 49–51 and accompanying text (granting R. Doc. No. 59), ensures that Joel has had every opportunity to fully present his arguments here.

it need not reach Joel's other arguments as to the invalidity of the provision that allows a court to disqualify a beneficiary after "[j]udicially determin[ing]" the beneficiary to be a slayer. *Id.* § 22:901(D)(1)(b).[70] Accordingly, having rejected Joel's procedural due process arguments, the Court concludes that Joel is disqualified from taking under either of his parents' life insurance policies.

### C.     Michelle & Angela, but not yet Alvin & Paula, are Entitled to the Benefits as Claimed

The Court now addresses the claims presented in the instant motions for partial summary judgment. The first is Michelle and Angela's (who are Joel's half-sisters) joint claim to Joel's share of their father's policy. The second is Alvin and Paula's (who are Lisa's siblings) joint claim to Lisa's policy. As explained below, the Court concludes that Michelle and Angela are entitled to the policy's benefits as claimed, but that Alvin and Paula have not yet carried their summary-judgment burden to prove that they are entitled to Lisa's insurance proceeds.

#### 1.     *Michelle & Angela are Entitled to Joel Sr.'s Benefits*

Michelle and Angela assert that they are entitled to the benefits remaining[71] under Joel Sr.'s policy because (1) they are Joel Sr.'s children, and (2) Joel is disqualified.[72] The Court agrees.

---

[70] *See* R. Doc. No. 57, at 7–14.

[71] Prior to commencing this action and depositing the interpleaded funds in the Court's registry, Transamerica paid "$50,833.33 each" to Michelle and Angela, R. Doc. No. 1-1, at 3 ¶ 13, out of the $152,500 due under their father's policy. *Id.* at 2 ¶ 6. The remainder—what Joel would have been due but for his wrongdoing—is what Michelle and Angela are claiming now.

[72] R. Doc. No. 30-2, at 4–5.

If Lisa had survived Joel Sr., then she alone would be entitled to his benefits as his "spouse"—the Certificate's first class of contingent beneficiaries.[73] But, as explained above, there is no record evidence that Lisa survived Joel Sr., so Lisa is statutorily deemed to have predeceased her husband. *See* La. Rev. Stat. § 22:911. Therefore, Joel Sr.'s benefits would pass under the Certificate to the next class of beneficiaries—his "lawful child or children."[74] The record evidence reveals that Joel Sr. had three children at the time of his death: Michelle, Angela, and Joel.[75]

Since Joel, one of those three children, is statutorily disqualified, the next question is who takes his share. Louisiana's slayer statute instructs courts to look first to the policy's terms (here, the Certificate) for alternate beneficiaries: "Where such a disqualification exists, the policy proceeds become payable to the secondary or contingent beneficiary or, if no secondary or contingent beneficiary exists, to the estate of the insured." La. Rev. Stat. § 22:901(D)(2). As for who is the "secondary or contingent beneficiary" here, the Certificate instructs that payments be made to the "first surviving *class* of the following class of persons:" first to the "lawful spouse," then to the "lawful child or children."[76] *See also Graves v. Garden State Life Ins.*, 887 So. 2d 506, 509 (La. Ct. App. 1st Cir. 2004) (interpreting an insurance contract to determine who was the "secondary or contingent beneficiary" under La. Rev. Stat. § 22:901(D)(2)).

---

[73] R. Doc. No. 1-1, at 15.
[74] *Id.* at 15.
[75] *Id.* at 3, ¶ 12.
[76] *Id.* at 15 (emphasis added).

Here, per the Certificate's terms, the contingent beneficiary is the *class* comprised of Joel Sr.'s lawful child or children. As stated above, Joel is statutorily excluded from that class, so his share reverts to others in the class. Therefore, the remaining children in the class—Michelle and Angela—will share Joel's portion equally, and Joel will take nothing.

2. *Alvin & Paula Have not Sufficiently Demonstrated their Entitlement to Lisa's Benefits*

The Court now turns to Alvin and Paula's (who, again, are Lisa's siblings) claim to Lisa's benefits. Just like above, since Joel Sr. was Lisa's "lawful spouse," had he survived Lisa, he would have been the first one entitled to her benefits, per the Certificate.[77] Again, however, there is no record evidence that Joel Sr. survived Lisa, so he is deemed to have predeceased her by law. *See* La. Rev. Stat. § 22:911. Therefore, the next in line under the Certificate is Lisa's "lawful child or children."[78]

But Joel was Lisa's only child,[79] and since Joel is disqualified for being her slayer, Lisa's benefits then pass to the Certificate's *third* category of contingent beneficiaries: Lisa's "lawful mother or father."[80] Lisa's mother, Joyce Madere, was alive when Lisa was murdered, but she has since died.[81] As of the date that the interpleader complaint was filed, Joyce's estate had not been opened.[82] This raises

---

[77] *Id.* at 15.
[78] *Id.*
[79] *Id.* at 5 ¶ 19.
[80] *Id.* at 15.
[81] *Id.* at 5 ¶¶ 21–23. This is what distinguishes Alvin and Paula's claim from Michelle and Angela's—Michelle and Angela both survived Lisa *and* are alive now, while Joyce is not.
[82] *Id.* at 1 ¶ 2; *id.* at 5 ¶ 23.

*at least* three issues that have not been briefed by Alvin and Paula,[83] all of which require additional briefing:

First, whether the rights to Lisa's policy vested in Joyce immediately upon Lisa's death, since Joyce survived Lisa.[84] If so, whether Joyce's estate *must* take Lisa's benefits, or whether her benefits may skip over the estate to the next class of beneficiaries in the Certificate—Lisa's surviving siblings. If Joyce's estate must take, a subsidiary question is whether Alvin and Paula—assuming they are Joyce's sole heirs[85]—may take on behalf of the estate without its presence in this case.

As to that legal issue, there remains an embedded factual and evidentiary issue: while Alvin and Paula have represented to the Court that they are Joyce's "surviving children" and the "successors and the ultimate beneficiaries for the death of Lisa Guy in the event that [Joel] is disqualified as a beneficiary,"[86] they have not

---

[83] Their briefing focuses solely on the choice-of-law issue and whether Joel is disqualified from taking Lisa's policy. R. Doc. No. 27-3, at 1–7.

[84] A leading commentary on insurance law suggests:
> In the absence of a specific contract provision specifying otherwise, and regardless of the nature of the insurance, and whether or not the beneficiary, prior to the death of the insured, was regarded as having a vested or a contingent interest, the right to the insurance fund vests, upon the death of the insured, in the surviving beneficiary; and the fact that he or she may subsequently die before payment is made by the insurer does not alter the course of the funds, other than to make them subject to disposal along with the beneficiary's other assets. Under these principles, where the death of the beneficiary named in a life policy occurs after that of the insured, but before payment of the insurance, the fund becomes a part of the beneficiary's personal estate, to the exclusion of any person named as a contingent beneficiary.

4 Steven Plitt, et al., *Couch on Ins.* § 61:38 (3d ed. 2021) (footnotes omitted).

[85] For the reasons about to be described, however, the Court cannot assume this based upon the evidence submitted by Alvin and Paula.

[86] R. Doc. No. 27-2, at 2–3 ¶ 6.

come forth with their own summary judgment evidence to prove as much. Instead, they rest on Transamerica's declaration, which was made before Joyce's estate was opened, and purported judicial admissions of Joel, Michelle, and Angela (only one of whom—Joel—has an interest adverse to their claim).[87]

But, as claimants to portions of the interpleaded funds, Alvin and Paula would have the burden at trial. They "must," therefore, "come forward with evidence which would 'entitle [them] to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop*, 939 F.2d at 1264–65 (citation omitted; alteration added). "If the moving party fails to carry this burden, the motion must be denied." *Delozier*, 500 F. Supp. 3d at 518; *cf. Wease v. Ocwen Loan Servicing, L.L.C.*, 915 F.3d 987, 997 (5th Cir. 2019) ("A movant for summary judgment need not set forth evidence when the nonmovant bears the burden of persuasion at trial.").

They have not met their burden. Transamerica's declaration may be competent summary judgment evidence, but it cannot say anything about who

---

[87] Alvin and Paula rely on three pieces of evidence: first, the declaration attached to Transamerica's complaint, which is now almost three years old and was made prior to Joyce's estate being opened. *See* R. Doc. No. 1-1, at 5 ¶ 23. That does not tell the Court who is entitled to take from Joyce's estate, since the estate had not been opened when it was made. Second, they argue Joel judicially admitted that they are Joyce's only remaining heirs; they cite his answer to the interpleader complaint, which states that Transamerica's declaration "speak[s] for [it]sel[f]." R. Doc. No. 12, at 3 ¶ 1. Such a cursory statement from a *pro se* litigant cannot justly be deemed a judicial admission. Third, they point to Michelle and Angela's answer and crossclaim, which "admit[ted] the allegations" contained in the relevant portions of Transamerica's complaint and "assert[ted]" that Transamerica's declaration "is the best evidence of its contents." R. Doc. No. 17, at 4 ¶¶ 28–30. That, without more, is also insufficient— particularly because Michelle and Angela consent to Alvin and Paula's claim and do not have an interest adverse to them.

inherits from Joyce's estate because it was made before the estate had been opened. Alvin and Paula have provided no other summary judgment evidence—not even an affidavit from the administrator or executor of Joyce's estate—that can assure the Court that they are the estate's *sole* heirs; and even that assumes Alvin and Paula may take on behalf of the estate, which, as noted above, they also have not sufficiently shown.

Second, and alternatively, it may be possible that the rights to Lisa's policy never vested in Joyce prior to her death. If that is the case, Alvin and Paula would need to assure the Court of the legal and factual grounds for so finding.[88]

Third, and alternatively, it may be possible that the Certificate's terms, standing alone, entitle Alvin and Paula to Lisa's policy. If that is the case, they would need to cite to the specific contractual provisions—and/or gap-fillers under Louisiana law—that entitle them to the proceeds of Lisa's policy. It may also require briefing on the rules for interpreting life insurance contracts under Louisiana law.

These three issues are illustrative, not exhaustive; Alvin and Paula may identify any other alternative ground that supports their position. In the course of answering these questions, however, Alvin and Paula must reference the *specific* terms of Lisa's policy and/or the Certificate, where applicable, along with any other pertinent legal authority.

---

[88] To answer that question, it may or may not be helpful to analyze the effect of Joel's surviving Lisa—*i.e.*, whether he had any vested rights (subject to later divestment) to her policy prior to his final judgment declaring that he was Lisa's slayer, or whether those rights never vested in him.

Accordingly, the Court will grant in part and deny without prejudice in part Alvin and Paula's motion for partial summary judgment. It will be granted insofar as Joel is conclusively declared ineligible to benefit from Lisa's policy. It will be denied, however, in that Alvin and Paula have not yet carried their burden—legally or factually—to show that they are entitled to any portion of Lisa's policy. This denial is without prejudice to Alvin and Paula's re-urging and sufficiently supporting their motion as ordered below.

## VI.   CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that Joel's motion for court-appointed counsel[89] is **DENIED**.

**IT IS FURTHER ORDERED** that Joel's motions to amend his motion for appointed counsel by appending to it an application to proceed *in forma pauperis*[90] and to amend his opposition memoranda to the motions for partial summary judgment if he is appointed counsel[91] are **DISMISSED AS MOOT**.

**IT IS FURTHER ORDERED** that Joel's motion[92] to amend his opposition memoranda to the motions for summary judgment is **GRANTED**.

**IT IS FURTHER ORDERED** that Michelle and Angela's motion[93] for partial summary judgment is **GRANTED**. Joel is hereby declared ineligible to receive his

---

[89] R. Doc. No. 55.
[90] R. Doc. No. 60.
[91] R. Doc. Nos. 56 & 58.
[92] R. Doc. No. 59.
[93] R. Doc. No. 30.

portion of Joel Sr.'s policy; instead, Michelle and Angela are entitled to that share: $48,302.21, plus 25.32% of the interest that has accrued on the registry funds.

**IT IS FURTHER ORDERED** that Alvin and Paula's motion[94] for partial summary judgment is **GRANTED IN PART** and **DENIED WITHOUT PREJUDICE IN PART**.  It is granted insofar as Joel is hereby declared ineligible to benefit from Lisa's policy; it is denied without prejudice to Alvin and Paula's re-urging and sufficiently supporting their motion by no later than **WEDNESDAY, JULY 28, 2021**.

New Orleans, Louisiana, June 28, 2021.

**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**

---

[94] R. Doc. No. 27.